**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOSEPH F. BENNETT,**

                          **Plaintiff,**               **1:07-cv-308**
                                                       **(GLS/RFT)**

               **v.**

**SHEELAH LUCIER; VIRGINIA MCQUADE;**
**RANDY EHRENBERG; THE BOARD OF**
**EDUCATION OF THE NORTH COLONIE**
**CENTRAL SCHOOL DISTRICT;** and
**THOMAS RYBALTOWSKI**

                          **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Cooper, Erving Law Firm               PHILLIP G. STECK, ESQ.
39 North Pearl Street, 4th Floor
Albany, NY 12207

Office of Thomas Marcelle            THOMAS MARCELLE, ESQ.
2 E-Comm Square,3rd Floor
Albany, NY 12207

**FOR THE DEFENDANTS:**
Towne, Ryan Law Firm                 JOHN F. MOORE, ESQ.
450 New Karner Road
P.O. Box 15072
Albany, NY 12205

**Gary L. Sharpe**
**District Court Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Joseph F. Bennett commenced this action against defendants under 42 U.S.C. § 1983, alleging that he was terminated from his position as teacher aide and lacrosse coach in retaliation for his constitutionally protected activities as a CSEA Union member.  (*See* 2d Am. Compl., Dkt. No. 77.)  Pending is defendants' motion for summary judgment.  (Dkt. No. 87.)  For the reasons that follow, the motion is denied.

### II. Background

In 1995, defendant North Colonie Central School District hired plaintiff Joseph F. Bennett as varsity lacrosse coach.  (*See* Defs. SMF ¶¶ 13-14, Dkt. No. 88:12.)  In 2002, while still acting as coach, Bennett was hired by the District as a one-on-one teacher aide for S.B., a severely disabled student.  (*See id.* at ¶¶ 21-23.)  Bennett's duties as S.B.'s aide included changing S.B. twice per day, feeding him, working with him with music, taking him to physical therapy, reading to him, taking him in and out of his wheelchair, and accompanying him to classes.  (*Id.* at ¶ 24.)

2

In November 2005, Bennett became President of the Civil Service

Employees' Association (CSEA) Teacher Aide Unit.  (*Id.* at ¶ 49.)  In his

role as Unit President, Bennett was responsible for participating in union

contract negotiations, and for representing teacher aides in the District in

disciplinary meetings and discussions with supervisors.  (*Id. at* ¶ 50.)

On November 30, 2006, teacher aide Peter Vottis met with defendant

Sheelah Lucier, Director of Pupil Services for the District and Bennett's

direct supervisor, and defendant Virginia McQuade, Assistant Director of

Pupil Services for the School District, to discuss allegations that he had

physically and verbally mistreated his one-on-one student, A.W.  (*See id.* at

¶¶ 105, 111.)  At the meeting, McQuade and Lucier denied Vottis's request

to be represented by Bennett and informed Vottis that he was being placed

on administrative leave.  (*See id.* at ¶¶ 11-12.)

Following the meeting with Vottis, Lucier met with Bennett regarding

the matter.  (*See id.* at ¶ 116.)  During that meeting, Lucier told Bennett

that Vottis was being placed on administrative leave, that there were

concerns for A.W.'s safety, and, according to Bennett, that A.W.'s mother

requested that Vottis be removed as A.W.'s aide.  (*See id.* at ¶ 117; Pl.

Resp. to SMF ¶ 117, Dkt. No. 89:2.)  Following the meeting, Bennett, in his

capacity as Union President, sent a letter to Lucier protesting the treatment of Vottis and contesting the charges against him.  (*See* Defs. SMF at ¶ 120, Dkt. No. 88:12; Dec. 1, 2006 Letter, Dkt. No. 87:30.)  In the letter, Bennett protested, among other things, the denial of Vottis's request for union representation at the meeting.  (*See* Dec. 1, 2006 Letter, Dkt. No. 87:30.)

On December 4, a disciplinary hearing was held, during which Lucier and McQuade met with Vottis, who was accompanied by Bennett as his union representative.  (*See* Defs. SMF ¶ 121, Dkt. No. 88:12.)  At the hearing, Lucier and McQuade explained the allegations against Vottis, and, according to Bennett, Lucier repeated the claim that A.W.'s mother requested that her son's aide be changed.  (*See id.* at ¶ 122; Pl. Resp. Mem. of Law at 2-3, Dkt. No. 89.)  Ultimately, Lucier told Vottis that he could either resign or go through the termination process, and that he should discuss the choice with Bennett and let her know during the week.  (*See* Defs. SMF ¶ 122, Dkt. No. 88:12.)  According to Bennett, feeling Vottis was being treated unfairly, he questioned whether Lucier had gathered all the facts, including whether she had spoken with others who worked with Vottis, and inquired "why there was such a rush to judgment

4

concerning Vottis." (Pl. Resp. Mem. of Law at 3, Dkt. No. 89.) Following

the hearing, Bennett sent a memorandum to Lucier, which summarized his

observances and comments that he had addressed at the hearing. (*See*

Defs. SMF ¶ 123, Dkt. No. 88:12.) As with Bennett's December 1 letter,

this memorandum was critical of the District's handling of the Vottis matter,

noting that the hearing appeared to be nothing more than a "mere

formality," and generally criticizing the tack taken by the District in

disciplining teacher aides. (*See* Dec. 5, 2006 Mem., Dkt. No. 87:31.)

Later that same day, Bennett contacted Mrs. Hale by telephone,

identifying himself as Teacher Aide Unit President of the CSEA. (*See*

Defs. SMF at ¶¶ 124-25, Dkt. No. 88:12.) While the specifics of this

conversation appear to be in dispute, Mrs. Hale testified that the two

discussed "why [Mrs. Hale] wanted [Vottis] replaced or something to that

effect." (Hale Dep. at 7, Dkt. No. 87:15.) According to Bennett, Mrs. Hale

did not indicate that she had made any request to have Vottis replaced as

A.W.'s aide. (*See* Pl. Resp. Mem. of Law at 3, Dkt. No. 89.) Mrs. Hale's

testimony is consistent with this version of events. (*See, e.g.*, Hale Dep. at

7, Dkt. No. 87:15.)

The next day, December 5, Bennett claims he met with Lucier and

confronted her about the conversation he had with Mrs. Hale, accusing her of misrepresenting Mrs. Hale's viewpoint, and telling her that Vottis would not be resigning.  (*See id.* at  ¶ 133; Pl. Resp. Mem. of Law at 4, Dkt. No. 89.)  Bennett claims that Lucier became angry with Bennett for not taking her statement at face value and for being uncooperative regarding Vottis's discipline.  (*See* Pl. Resp. Mem. of Law at 4, Dkt. No. 89.)  Defendants deny that Lucier ever discussed the telephone call between Bennett and Mrs. Hale with Bennett.  (*See* Defs. SMF ¶ 133, Dkt. No. 88:12.)

In further support of Vottis, Bennett gathered letters of support from, among others, Catholic Charities disabilities service coordinator Debbie Mieseng, teacher John Doolittle, teacher aide Audra Jones, and coach Ernest Ripepi.  (*See id.* at ¶ 168.)  These letters were then provided to High School Principal Richard Murphy in a letter.  (*See id.* at ¶ 169.) According to Bennett, these efforts further angered Lucier.  (*See* Bennett Aff. ¶ 69, Dkt. No. 91:3 (citing Lucier Dep. at 75-76).)  Bennett also claims that his approach to representing Vottis did not sit well with defendant Thomas Rybaltowski, the District's Assistant Superintendent for Business.  (*See* Pl. Resp. Mem. of Law at 4-6, Dkt. No. 89.)  According to Linda Mosher, a CSEA representative with whom both Bennett and Rybaltowski worked,

she had a conversation with Rybaltowski in December 2006, during which

Rybaltowski indicated that disciplinary charges would likely be brought

against Bennett in light of the "aggressive stance" he was taking in the

representation of Vottis.  (*See* Mosher Dep. at 15-18, Dkt. No. 87:17.)

Shortly thereafter, on December 18, McQuade restricted the use of

the telephone in classroom K114, the classroom to which Bennett was

assigned.  (*See* Defs. SMF ¶ 156, Dkt. No. 88:12.)  According to

defendants, the restrictions were put in place because Ms. Hushmendy, the

K114 classroom teacher, complained that the volume of telephone usage

in the classroom was disruptive.  (*See id.* at ¶¶ 148-154.)  Under the

restrictions, teacher aides in room K114 were required to log all incoming

and outgoing calls, and could use the phone for "school business" only.

(*See id.* at ¶ 156.)  The restrictions also prohibited teacher aides from

answering incoming calls, permitting only the classroom teacher or

teaching assistant to answer the phone.  (*See id.*)

Prior to the December 18 restrictions, Bennett received calls on the

K114 telephone relating to his duties as a union representative—including

calls from Lucier or teacher aides regarding disciplinary issues, from other

CSEA unit people, and from Linda Mosher—as well as calls relating to his

coaching duties and personal matters.  (*See id.* at ¶ 142.)  In a December 22 memorandum to McQuade, Bennett protested the phone restrictions, stating, among other things, that "[a]s the Unit President for CSEA I receive calls with regard to union business with regard to ongoing issues within the district.  Under the Taylor Law I have the right to conduct this business and you are not allowed to interfere in [m]y ability to do so."  (Bennett Aff., Ex. D, Dkt. No. 91:3.)  Bennett further stated that "[y]our directive is disruptive to both the teacher and the aides and is an issue we need to discuss and work out."  (*Id.*)

On January 22, 2007, Lucier met with Bennett, asked him to attend a meeting later that day, and strongly advised him to have a CSEA representative with him.  (*See* Defs. SMF ¶ 185, Dkt. No. 88:12.)  As requested, Bennett attended the meeting with Linda Mosher, his union representative.  (*See id.* at ¶ 187.)  During the meeting, Lucier served Bennett with formal disciplinary charges; put Bennett on thirty-day, unpaid administrative leave; and scheduled a formal disciplinary hearing for February 12, 2007.  (*See id.*)

The District's process for bringing disciplinary charges is not entirely clear from the parties' submissions.  (*Compare id.* at ¶ 181, *with* Pl. Resp.

8

SMF ¶ 181, Dkt. No. 89:2.)  Defendants contend that the decision to bring

disciplinary charges against Bennett was made by Lucier, his direct

supervisor, in consultation with the District's attorney, David Morris, who

would then advise defendant Rybaltowski of the formal charges.  (*See*

 Defs. SMF ¶¶ 6,181, Dkt. No. 88:12.)  In line with this contention,

defendants claim that the formal charges against Bennett were drafted by

Morris, and that Rybaltowski was not involved in that process or with

investigating the allegations or deciding to bring the charges.  (*See id.* at ¶

182.)  According to defendants, "Rybaltowski simply [told Morris] that

defendant Lucier had information regarding situations and that he would

need to talk about the details."  (*Id.*)  Ultimately, after the charges were

drafted, they were discussed and authorized by defendant Board of

Education during Executive Session at a meeting on January 22, 2007.

(*See id.*)

Bennett largely disputes this characterization of events.  According to

Bennett, the testimony of several of the defendants establishes that

"Rybaltowski was the ultimate decision-maker with respect to the discipline

of the teacher aides," including whether or not to bring disciplinary charges

in the first instance.  (Pl. Resp. SMF ¶¶ 7, 181, Dkt. No. 89:2 (citing

9

Ehrenberg Dep., Dkt. No. 87:12; Lucier Dep., Dkt. No. 87:13; McQuade

Dep., Dkt. No. 87:14).)  According to the testimony of Randy Ehrenberg,

Superintendent of the District, Rybaltowksi would begin the disciplinary

process by "gather[ing] information ... and then [the] district['s] attorney

would be involved."  (*See id.* (quoting Ehrenberg Dep. at 41, Dkt. No.

87:12).)  Ehrenberg further testified that in the case of teacher aides, it was

Lucier who would typically bring the information to Rybaltowski and he

would decide whether to bring disciplinary charges.  (*See* Ehrenberg Dep.

at 41, Dkt. No. 87:12.)

The disciplinary charges served on Bennett accused him of six forms

of misconduct.  The first charge alleged that Bennett, "on several

occasions, breached the confidentiality of [his] position."  (Defs. SMF ¶

188, Dkt. No. 88:12.)  Defendants claim that this charge refers to Bennett's

contact with service providers for both S.B. and A.W. in violation of the

District's rules.[1]  (*See id.* at ¶ 190.)  Bennett denies this assertion,

---

[1]The District's teacher aide handbook provides that teacher aides are required to "maintain confidentiality of incidents, as directed by teacher"; that "teacher aides should not share information [they] have about students with any staff other than those individuals who are directly involved with the students," since "[a]ll information is confidential"; and that the "supervising teacher will direct any parent contact."  (Defs. SMF ¶¶ 29-31, Dkt. No. 88:12. (internal quotation marks and emphasis omitted).)  Defendant Ehrenberg testified, however, that the District rules did not restrict union representatives from contacting parents.  (*See* Ehrenberg Dep. at 23, Dkt. No. 87:12.)

contending that the first charge concerned only his telephone call to Mrs. Hale regarding the Vottis matter.  (*See* Pl. Resp. SMF ¶ 190, Dkt. No. 89:2; Pl. Resp. Mem. of Law at 8, Dkt. No. 89.)

The second disciplinary charge accused Bennett of being "insubordinate to [his] immediate supervisor Ms. Dilnavaz F. Hushmendy with regard to her authority to restrict use of the classroom telephone to school district purposes."  (Defs. SMF ¶ 188, Dkt. No. 88:12.)  This charge relates to a phone conversation that Bennett had with Ms. Hushmendy.  (*See* Defs. SMF ¶ 191, Dkt. No. 88:12.)  Specifically, on December 20, Bennett called the classroom concerning the whereabouts of a student.  When Ms. Hushmendy answered the phone, Bennett said something to the effect of "just verifying you picked the phone up," (Disciplinary Hr'g, Hushmendy Test. at 87, Dkt. No. 87:7), or "it's a good thing that a teacher aide did not answer the phone," (Pl. Resp. SMF ¶ 191, Dkt. No. 89:2.)  Bennett claims that he was jokingly referring "to the fact that teacher aides were now prohibited from the answering the phone," and that he and Ms. Hushmendy laughed at the remark.  (Pl. Resp. Mem. of Law at 8, Dkt. No. 89.)

The third disciplinary charge related to Bennett's December 22

11

memorandum to McQuade protesting the newly-enacted telephone restrictions, accusing Bennett of being "insubordinate to ... McQuade with regard to the use of the classroom telephone." (Defs. SMF ¶ 188, Dkt. No. 88:12.)

The fourth disciplinary charge alleged that Bennett "ha[d] been observed and ha[s] admitted making improper and/or inappropriate use of the telephone in the [K114] classroom for personal purposes, CSEA Union purposes and other purposes beyond the scope and outside the parameters of [his] employment." (*Id.* at ¶ 188.) According to defendants, this charge stems from "the fact that [Bennett] continued to use the phone in K114 when he was supposed to be working with his disabled one-on-one student, who would be left alone while [Bennett] was on the phone." (*Id.* at ¶ 193.) Bennett denies this assertion, contending that "all personnel in the room used the phone in the same manner as [him], and that [he] never left his student uncared for." (Pl. Resp. SMF ¶ 193, Dkt. No. 89:2.)

The fifth disciplinary charge accused Bennett of being "absent from his employment obligations without appropriate notice to or permission from [his] supervisors." (Defs. SMF ¶ 188, Dkt. No. 89:2.) According to defendants, this charge related to Bennett being absent from work in

12

September and October 2006 "after prior concerns had been raised at his

previous annual evaluations."  (*Id.* at ¶ 194.)  However, Lucier testified that

she could not explain the factual basis of this charge because she did not

know what it was.  (Lucier Dep. at 111, Dkt. No. 87:13.)  In addition,

Bennett claims that the charge appears to relate to his absences due to

"physical therapy appointments and the one instance in which he left

school to bring his sick daughter home because she was vomiting," (Pl.

Resp. Mem. of Law at 9, Dkt. No. 89), and that certain of these "absences

... were protected under the Family and Medical Leave Act,"  (Pl. Resp.

SMF ¶ 194, Dkt. No. 89:2).

The sixth and final disciplinary charge accused Bennett of having

"knowingly made false entries on [his] time cards indicating [his] presence

in school when [he] had, in fact, either left school premises or [his]

assigned work location."  (Defs. SMF ¶ 188, Dkt. No. 88:12.)  According to

defendants, this charge "was based upon Principal Murphy's observation of

[Bennett] leaving the school early on December 22, 2006 after which, in

January 2007, it was revealed that [Bennett] had been leaving his

employment obligations early but was filling out his time card as if leaving

[on time]."  (*Id.* at ¶ 195.)  Bennett denies this allegation, claiming that he

13

"never made a false entry on his time card," and that "Principal Murphy had no knowledge of [his] daily schedule." (Pl. Resp. SMF ¶ 195, Dkt. No. 89:2.) Bennett also claims that Principal Murphy "mis-identified [him] leaving school," and contends that "another aide who was found to have falsified the amount of time stated on her card was not terminated, but was allowed to sign in and out at the front office," suggesting that he was treated differently. (*Id.*)

Disciplinary hearings were held on the six disciplinary charges on February 12 and 18, and March 15, 2007. (*See* Defs. SMF ¶ 198, Dkt. No. 88:12.) At the outset of the hearings, it was announced that Stephen Beditz would act as the presiding officer, and that defendant Ehrenberg would act as the hearing officer and issue a written decision. (*See id.* at ¶ 216.) Pursuant to the teacher aide union contract, Ehrenberg retained the authority to be the ultimate decisionmaker as to the charges. (*See id.* at ¶ 212.) According to Bennett, Ehrenberg's role in the hearing was not one of impartiality, contending that "her job [was] not to be neutral but simply to act as a manager reviewing the actions of her subordinates in a more formal setting." (Pl. Resp. SMF ¶ 207, Dkt. No. 89:2.) Bennett also notes in this regard that "[Ehrenberg] was not called upon to address whether

Union activity played any role in the disciplinary process." (*Id.*)

At the hearings, Bennett was represented by counsel, allowed to call witnesses, take testimony, and provide evidence in the proceedings. (*See* Defs. SMF ¶ 199, Dkt. No. 88:12.) After each hearing date, Ehrenberg conferred with Beditz to review what had occurred. (*See id.* at ¶ 212.) Ultimately it was decided that Beditz would draft a decision based upon those conversations for Ehrenberg's review and eventual signature. (*See id.*) At the conclusion of the hearings, briefs were submitted by the parties. (*See id.* at ¶ 213.) After Ehrenberg and Beditz reviewed the briefs and discussed the proof, Beditz drafted a decision and sent it to Ehrenberg for her review. (*See id.* at ¶ 214.) Ehrenberg then reviewed the decision, made suggestions, and issued her final decision on July 9, 2007. (*See id.* at ¶¶ 215, 249.) In the decision, Ehrenberg found Bennett guilty on the first, third, fourth, fifth, and sixth charges, and recommended that Bennett be terminated. (*See id.* at 249.) Thereafter, at the July 2007 Board of Education meeting, the Board of Education accepted Ehrenberg's recommendation of dismissal and Bennett was terminated as a teacher aide. (*See id.* at 250.)

In early March 2007, prior to the completion of Bennett's disciplinary

hearings, Ehrenberg recommended that David Herman, Director of

Physical Education and Athletics, terminate Bennett as varsity lacrosse

coach.  (*See id.* at ¶ 231.)  Ehrenberg claims that, based on what she was

hearing in the disciplinary hearings, she questioned Bennett's values and

was concerned because of "the great deal of influence" that varsity

coaches have on students.  (*See id.* at ¶ 232.)  Ultimately, by letter dated

March 2, 2007, Herman advised Bennett that he was dismissed as varsity

lacrosse coach.  (*See id.* at ¶ 237.)

On March 23, 2007, Bennett commenced this action under § 1983,

alleging that he was: (1) retaliated against for union activity in violation of

the free speech clause of the First Amendment; (2) retaliated against for

advocating on behalf of a fellow teacher aide in violation of the First

Amendment's freedom of association protections; and (3) that defendants

acted with reckless disregard of his constitutional rights and with malice

towards him.  (*See* Compl., Dkt. No. 1, *see also* 2d Am. Compl., Dkt. No.

77.)  Following discovery, defendants moved for summary judgment.  (*See*

Dkt. No. 88:13.)

### III.  <u>Standard of Review</u>

The standard for judgment pursuant to Rule 56 of the Federal Rules

of Civil Procedure is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle,* 499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).

## IV.  Discussion

### A.    First Amendment Retaliation

To establish a First Amendment retaliation claim, a plaintiff must demonstrate that "(1) his speech [or associational activity] addressed a matter of public concern, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech [or associational acitivity] and that adverse employment decision, so that it can be said that the plaintiff's speech [or associational activity] was a motivating factor in the adverse employment action."  *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (citation omitted).  However, even if a plaintiff can make this required showing, "defendants may nevertheless escape liability if they can demonstrate that ... the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech."  *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006) (citation omitted), *overruled on other grounds*, *Appel v.*

*Spiridon*, 531 F.3d 138 (2d Cir. 2008).

## 1.    Public Concern

Bennett claims that he was disciplined and ultimately terminated for engaging in union activity, including his representation of Vottis. (*See* Pl. Resp. Mem. of Law at 16, 17, Dkt. No. 89.)  In support of their motion, defendants argue that none of Bennett's union activity related to a matter of public concern.  (*See* Def. Mem. of Law at 4-7, Dkt. No. 88:13.) The court disagrees.

Whether a public employee's speech addresses a matter of public concern is a question of law that "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48, 148 n.7 (1983).  A statement is a matter of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community."  *Id.* at 146. On the other hand, "a statement by a government employee complaining about nothing beyond treatment under personnel rules," *Garcetti v. Ceballos*, 547 U.S. 410, 428 (2006), or "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment," *Lewis v. Cowen*, 165 F.3d 154, 164 (2d Cir. 1999), does not

18

implicate the First Amendment.

In general, union activity and efforts to unionize are matters of public concern. *See Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999).  Union activity includes a union official advocating on behalf of union members. *See, e.g.*, *Morey v. Somers Cent. Sch. Dist.*, No. 06 Civ. 1877, 2007 WL 867203, at *10 (S.D.N.Y. Mar. 21, 2007).  However, not all speech related to union activity is protected.  *See Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985) ("[A]n employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law.")  Rather, the "considerations underlying the 'public concern' test apply as equally to union activities as they would to any other speech by a public employee." *Heil v. Santoro*, No. 94 Civ. 9109, 1997 WL 102451, at *5 (S.D.N.Y. 1997).  Thus, a public employee's speech, even if union related, is not entitled to constitutional protection if it is "on matters of purely personal interest or internal [union] affairs." *See id.* at *4; *Clue,* 179 F.3d at 61; *see also, e.g.*, *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 722 (S.D.N.Y. 2005) (plaintiff's complaints to union not protected speech because they "related primarily if not exclusively to her desire to protect her job and/or her reputation as a school counselor"); *Fox v. Town*

19

*of E. Haven*, No. Civ. 302CV1540WWE, 2006 WL 287208, at \*6 (D. Conn. Jan. 6, 2006) (plaintiff's union activity not protected because it "related solely to efforts to reinstate her employment and obtain unemployment benefits").  Accordingly, courts must "closely examine references to union activity ... in order to determine whether the speech actually touches on a matter of public concern."  *Novak v. Bd. of Educ. of Fayetteville-Manlius Cent. Sch. Dist.*, No. 505-CV-199, 2008 WL 597183, at \*5 (N.D.N.Y. Feb. 29, 2008) (citation omitted).

Here, in advocating for Vottis, Bennett was clearly engaged in union activity as he was acting in his capacity as a union official on behalf of Vottis, and was not seeking to redress personal grievances or to enhance his own employment conditions.  Moreover, the court disagrees with defendants that Bennett's advocacy cannot fairly be considered as relating to any matter of public concern.  Specifically, as part of his representation of Vottis, Bennett confronted Lucier, a school administrator, regarding the honesty with which she was handling the disciplinary process.  Given the public's recognized interest in the "welfare and safety of young students," *see Cioffi*, 444 F.3d at 164, the court cannot say that a criticism of the manner in which a school administrator handles allegations of misconduct

20

against those employees charged with caring for those students relates
solely to "internal union affairs" and fails to touch upon a matter of public
concern.  Accordingly, defendants' motion as to this issue is denied.

**2.     Same Adverse Action Regardless of Protected Speech**

Defendants next argue that even if Bennett's speech related to a
matter of public concern, they are nonetheless shielded from liability
because they would have terminated Bennett regardless of his speech.
(*See* Defs. Mem. of Law at 7, Dkt. No. 88:13.)  The court agrees with
Bennett, however, that questions of fact preclude summary judgment on
this issue.  (*See* Pl. Resp. Mem. of Law at 20-22.)  While there is evidence
suggesting that the District may have had non-retaliatory justifications for
disciplining and terminating Bennett, much of the conduct underlying those
justifications remains largely in dispute.  In addition, Bennett has offered
sufficient evidence—including the testimony of Linda Mosher relating to
defendant Rybaltowski's allegedly questionable motivations for bringing
disciplinary charges against Bennett—to suggest that defendants' proffered
non-retaliatory justifications were pretextual.

Accordingly, because questions of fact remain as to whether defendants
would have terminated Bennett regardless of his speech, defendants

motion as to that issue is denied.

**3.     Limitation on First Amendment Rights**

Defendants also argue that Bennett's First Amendment claims should

be dismissed because Bennett has not shown that his suspension or

termination as teacher aide or lacrosse coach "restricted him from

engaging in union activities protected by the First Amendment."  (*See* Defs.

Mem. of Law at 15, Dkt. No. 88:13.)  However, such a showing is not

required to prevail on a First Amendment retaliation claim.  *Morrison v.*

*Johnson*, 429 F.3d 48, 51 (2d Cir. 2005) ("[I]n no case have we held that a

public employee plaintiff is required to show that the defendants' action had

an actual chilling effect [on his First Amendment rights].").  Accordingly,

defendants' motion on this issue is denied.

**B.     <u>Qualified Immunity and Individual Liability</u>**

**1.     Qualified Immunity**

Defendants argue in an abbreviated fashion that Lucier, McQuade,

Ehrenberg, and Rybaltowski are entitled to qualified immunity.  (*See* Pl.

Resp. Mem. of Law at 18, Dkt. No. 88:13.)

"The doctrine of qualified immunity shields government officials from

liability for civil damages when their conduct does not violate 'clearly

established statutory or constitutional rights of which a reasonable person would have known.'" *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 359 (2d Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "[W]here ... specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Reuland v. Hynes*, 460 F.3d 409, 419, 420 (2d Cir. 2006) (citation and internal quotation marks omitted) (noting that a defendant in First Amendment retaliation claim is entitled to qualified immunity "only if a finder of fact determined that he had no retaliatory motive" in disciplining the plaintiff).  Here, because Bennett's retaliation claims turn on several questions of unresolved fact, including the intent with which the defendants acted in deciding to discipline and terminate Bennett, the court is unable to conclude as a matter of law that defendants are qualifiedly immune from liability.  Accordingly, the court denies defendants' motions on the issue of qualified immunity.

**2.     Personal Involvement of Rybaltowski and Ehrenberg**

Defendants next argue that Bennett's claims against Rybaltowski and Ehrenberg should be dismissed for lack of personal involvement.  (*See*

Defs. Mem. of Law at 19-22, Dkt. No. 88:13.)  The court disagrees.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (citation and internal quotation marks omitted).  In the context of a First Amendment retaliation claim, a supervisory official is deemed personally involved where he actively participates in the disciplinary process leading to the plaintiff's termination.  *See Rolon v. Ward*, 345 Fed. Appx. 608, 610 (2d Cir. 2009) (unpublished).  Here, the record demonstrates that both Rybaltowski and Ehrenberg participated directly in the disciplinary process that led to Bennett's termination. Accordingly, defendants' motion is denied insofar as it seeks dismissal for lack of personal involvement.

## C.  **Punitive Damages**

Bennett's third cause of action, seeking punitive damages, alleges that defendants acted with reckless disregard of his constitutional rights and with malice towards him.  (*See* 2d Am. Compl. ¶¶ 52-54, Dkt. No. 77.) In seeking dismissal of this claim, defendants argue that the record does not support a finding that they acted with either reckless disregard or

malice.  However, at this juncture, given the record currently before it and the questions of fact remaining, the court permits this cause of action to survive.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 87) is denied; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

December 9, 2010
Albany, New York

_____
United States District Court Judge